Next, we have Pumadol Tamati. Pumadol Tamati versus the Bank of America. Okay, I think I got them both. It's the last argument of the week. It brings the best out of Jeff Pato. Oh, thank you, Your Honor. May it please the court, Jack Peacock here for the Thamathitikans. Oh. Excuse me. I tried. Sorry. It's a difficult name to pronounce. To begin with, I'll probably just like to hit a few high points that are in the briefs. I know you've read the briefs. But as the court may recall, this case involves a property in Tyler, Smith County, Texas, that was the home or purchased for the home for the Thamathitikans. They lived there for a number of years. As the court may recall from the transcript and the briefs, they had some physical problems. She had numerous surgeries. He had a brain tumor. And so they had to deal with these issues, which necessarily caused financial issues. So there's a history here of the Thamathitikans trying to work things out from time to time with Bank of America and then with the lenders that took over after that and the servicer. The servicer being New Penn Financial, LLC, but they do business as Shell Point. So that's why in the briefs you see the letters SMS, that's Shell Point Mortgage Services. So during this time, of course, they're getting by the best way they can. And without belaboring a lot of the difficult fact situations, they came to a point where the Thamathitikans received a notice of foreclosure sale. Well, first they received one in August of 2014 and again in September and then again in October. The ones in August and September were postponed, and so she called SMS to try to arrange for some kind of arrangement so that the property would not be foreclosed. At that time they had approximately $100,000 in equity in the property. They didn't want to lose the property. And at that time the Thamathitikans, Mr. and Mrs. Thamathitikans, had to move to Dallas where she could make enough money to try to pay for these things, the property and so forth. And so her children were living at the property at this particular time. All right. So as you may recall, the evidence showed at trial, and by the way, this was a bench trial with the United States magistrate there in Tyler. Part of the testimony was the conversation that Mrs. Thamathitikans had with the SMS representative. That's in the transcript, and so I won't read all of it, but there's part of it here that is very important, and I do want to read just a little bit of it. In its own, it's in several places. It's in the exhibits. It's also in Volume 2 of 5, and on page 738 it starts. But in the course of the conversation, which is a fairly lengthy conversation, the CSR, which is the customer service representative, states in part, well, she says, I'm trying to get enough money to pay it but haven't been able to pay it all. She had saved up $11,000 to pay on this, but she owed a little more than that. Okay. His response, right, and that's fine, and see what's going to happen once we are able to set up a repayment plan. We can use those funds as a down payment to start the repayment plan. Then we will spread the remaining delinquent amount. We'll spread it out over a period of 12 months. That's how our repayment plans will work. Okay? And she answers, okay. Now, going over to the next page, page 740 in the transcript, then about a third of the way down on the page she says, okay, and they're not going to foreclose on the house while we're doing this? His answer, right. Once you get that in, that's an active workout with the company. So once you have some ---- Mr. Peacock, I've read that a few times. I'm not sure what Mr. Taylor meant. It seems, I don't know if it's concession, opposing counsel, that this was a misstatement, but what do you think the proper way to read once you get that in, that's an active workout plan? That sounds like, I'm not sure what that's referring to. Do you think she got that in, whatever that is? The active workout plan? Well, I don't know. He's saying the premise for not foreclosing is that you must get that in. Well, that's true. What do you think that person is referring to? Well, they send out a form, and they send it out, the evidence is they send it out the same day, October the 3rd. She got it. She already had the generic form, and she filled it out and sent it to them on the 3rd, the same day. But that's, well, let me explain it this way. The Consumer Financial Protection Bureau has in its regulations, and it's not part of this case, but to answer your question, has regulated this and has stated that it's improper for a lender to foreclose while there is an active workout being pursued by the homeowner. So that's probably one of the reasons why he said that, well, once we get that in and there's an active workout, then there's no foreclosure. But as I view it, that particular statement is not really the point or the issue of where I want to go. When she says, okay, they're not going to foreclose on the house while we're doing this, right, and then he talks about once you get that in and so forth. And then she says, okay, so is it active at this point? His answer, no, it's only active until we get the information back from you. And then she says, this is starting to get really significant now. Okay, because I don't, this is her statement, because I don't know. They had sent me a letter last month that said that they were going to foreclose, and I called and talked to the lady here at this number. She was going to send me some stuff that I never got, and I'm afraid they're going to foreclose before I even get the information from you. His response is, right, you don't have a sale date, so that's not an issue, okay? She says, there's not one now? His response, exactly. You're in good standing, and so forth and so on. There's no sale date. I think earlier in the process your clients would have had an opportunity to pay up and reach a repayment schedule or something, but those timelines had passed where I think we were at the point where it was totally discretionary on the part of the other side to work out some sort of deal. Does that make a difference that it wasn't like your client still had a right to stop the forfeiture? It was totally up to the other side, and then this misrepresentation took place. Absolutely. Does that misrepresentation have some sort of effect when it was totally discretionary up to them as to whether they were going to give your clients another opportunity or not? Well, and to answer your question, Your Honor, yes, it was at this point totally discretionary with the lender. The lender was under no obligation to do this. The lender, the customer service representative, could have just said, sorry, you're too late, you can't reinstate, we're not going to do a repayment plan, we're going to foreclose. Then she would have known what she needed to do at that point. All right. So I think clearly it's a misrepresentation because they did foreclose. And this is to make a complicated case simple. What we have here is a situation where the company sends out a notice or has a notice sent out that says we're going to foreclose on your property on October the 7th. Then the company says to her in this telephone conversation, there's no sale date. Okay? That's what they say to her. And she relies on it. Okay. And then the next thing that happens is she sends in the repayment stuff, all of that, but they foreclose. Simply, that's exactly what happened. We have a clear misrepresentation. So what are her remedies then? Well, you get remedies after there's been a violation. You said she relies on it. What was her reliance, and what way did she alter her conduct in reliance on that misstatement? Well, to begin with, as he's telling her these things, she's saying, okay, okay, what do I do now? What do I do next? And she does these things. They send her the application. Before she even gets the application, she already had a generic form that she had from Bank of America that didn't have Bank of America's name on it. She used that to get it to him right away on October the 3rd. So clearly she was relying. Right, but as far as injury arising from some legal injury arising from the reliance, it seems to me that you haven't yet articulated what she did that caused her to forego some other way that perhaps she could have headed off this foreclosure or in some other way was out money that she otherwise would not have been out. I mean, I certainly think she relied on it mentally, but how did she rely on it in some legally significant way? I'm sorry, Your Honor. I'm not sure I understand. That's fine. You're not the first person standing there who had that reaction to one of my questions, so nor will you be the last. But I'm just trying to think in what way during those four days did she do something because of that phone call that caused her to miss out on an opportunity she otherwise would have had? Well, as we all know, had she had known that they were going to foreclose, she had various legal remedies that she could have pursued to stop the foreclosure. I mean, bankruptcy is one remedy. She could have asked Mr. Varicki to present the matter to a court, asked for a restraining order. There's a number of remedies, legal remedies, that are available. Had she known that they were not going to pursue the repayment plan option as they had promised, but rather just foreclosed? I don't know. Did I answer your question, Your Honor? You certainly gave me an answer and a good one. Go ahead. All right. Thank you. So in our briefs, I believe we've pointed out what we believe are the errors that the trial court made in its findings of fact and conclusions of law. Now, where I want to go now is I'm thinking that the court is probably thinking, okay, well, let's just assume for the moment that plaintiff, appellant, you are correct. The court made those errors in its findings of fact and conclusions of law. What does that get us as far as down the road? How do we get around the fact of what the trial court said in several places, that the foreclosure ended and was the cause of all of her damages? So how do you handle that? Your time's up. Oh, I'm sorry. I wasn't even watching. Your brief has covered these things. Pardon me? Your brief has covered these things. Okay. You still have five minutes for rebuttal. Okay. Okay. I'll just do it then. Thank you, Your Honor. Mr. Massa. Good morning, Your Honors. The appellant's arguments on appeal with regard to causation and reliance focus overwhelmingly on hypotheticals and speculation. There's simply a lack of evidence of what actually would have happened had this statement not been made. What we hear time and time again at trial in the briefs and just now from Mr. Peacock is that there are things that Mrs. Thamathirikun could have done if she had supposedly gotten correct information. But what we don't hear, whether it be now or at the trial court, we have never heard what she would have done and what would have happened and whether those acts, if they actually would have happened, would have indeed stopped the foreclosure. The foreclosure is the harm. So where is the link between all these things that could have theoretically occurred and actually preventing the foreclosure? That is what the district court focused on in its findings, and I think it's absolutely critical that those findings be upheld. There are a few arguments we make in our brief. I'm really just going to mention two of them for reasons why that there was not an abuse of discretion in this case. Number one, there was not an abuse of discretion in denying the Thamathirikun's motion to alter or amend the judgment because the arguments that they're actually making on appeal, which are the same arguments they made in that motion, were never brought up with the trial court prior to trial. If you look in the order, in the record, denying the motion to alter and amend, the district court goes to great pains to explain that. Mr. Peacock, in his brief, and now there's a lot of discussion about this distinction between a reinstatement plan and a repayment plan. That may or may not be a distinction with a difference, but the point is it was never argued to the trial judge before trial, and that was one of the reasons given for denying that motion. So I think that's one easy reason that there was not error, there was not an abuse of discretion. But even more so, let's look at the meat of the matter. As Judge Southwick was alluding to a moment ago, what actually was the reliance? What was the evidence that this statement, whether it was false or otherwise, we can assume that it was false or erroneous at least, actually caused her to do or not do something? And there's, when you look at the arguments that they make, I think these concepts or these speculative hypotheticals come into two categories. One is that they would have reached some sort of agreement with the servicer, this repayment plan, and number two is that they could have taken some legal action to actually prevent the foreclosure from happening. Mr. Peacock focused at least at first on the potential of a repayment agreement, so I'll start with that. Again, this comes back to things that could have happened versus evidence of things that would have happened. And in this case, the district court fixated on a couple of things. Number one, as Your Honour mentioned a moment ago, that this was entirely discretionary with the servicer. There was no promise that a forbearance would occur, that the foreclosure would not happen. The idea was, send us this paperwork, we will look at it, it's got to get approved by underwriting, it's got to go through some steps, and we can enter into a repayment plan, certainly that's a possibility. But the Thamathitakun's trial never took it to the next level. They never had an expert, for example, come in to say, okay, here's the information you were going to present, and here's why the servicer would have accepted it, and here's why it would have all worked out and you would have gotten to keep your house. That never happened. And the district court, I think, singled this out, saying this was entirely speculative at this point, that it actually would have gone that far. And I think it's also important to note, the district court notes it, that the application that the servicer, that my client, SMS, actually sent the Thamathitakun's was never returned. So not only was it not approved by underwriting, there was not evidence that an agreement would have been reached, the application actually never got there. I know there's testimony about a similar application from another bank that was sent in, but the district court notes in its findings that the application we sent them, the one document we said would start the process for us, never got returned. Would they have gotten that in September? It was the... There was a form from Bank of America that came sometime prior to the October 3rd conversation with Mr. Taylor that's the central focus of all of this. Mr. Taylor put a new form in the mail to them that day, one from us... On October 3rd? On October 3rd, or maybe it was October 4th, but right around that time. It was sent to the Thamathitakun's and never returned, and that wasn't disputed at trial and it's not disputed on appeal. The appellants acknowledged that it was their inability to pay for the mortgage that ultimately caused them to lose the house. If we look at sort of that second bucket of potential actions that could have been taken, potential legal actions, and Mr. Peacock alluded to them here again, there's a lot of argument and a lot of innuendo about things that could have been done. They could have declared bankruptcy. They could have gotten a TRO, but there was never any evidence, none at all at trial, let alone enough to warrant reversing a finding of fact. No evidence that any of those things would have actually happened. In fact, the district court described it this way, saying that the appellants said that they would have consulted with an attorney, but, and I quote, this hypothetical is unconvincing because they had received foreclosure notices at least two times prior and done nothing. They hadn't done anything then, so the trial judge, weighing the credibility of the evidence, decided that that was just too speculative. It was too hypothetical and it was simply unconvincing that they would have done something different this time if the statement hadn't been made. Let me ask about this evidence and how it fits. She had indicated she had $11,000 or so as of that date. Was there any evidence of how, what, $11,000 would have been likely to entitle the debtors to deal with your client? There was none. I mean, she said, and maybe in the recorded conversation, I can't remember where this comes from, that this is not quite some number that she had been told. What number was she told and what would that have done? I don't believe there was a number that was given, and I think that is some of the evidence that is this critical missing link. If there had been, for example, a statement that, all right, if you can come up with $15,000, then we'll take the foreclosure off and the foreclosure won't happen. And then she put on evidence that I've got $15,000 and it all would have sailed through, underwriting would have approved it. That conceivably could have amounted to support a finding that the foreclosure never would have happened and they would have gotten to keep the house. Is there no number that's in play coming from your client? I don't believe there was, Your Honor. All right. I don't believe there was. From some previous period of time, not during this phone call, but a month earlier, two months earlier, here's what it would take to bring the loan current. I'm not aware of any. All right. No specific statement. Mr. Taylor, who made the misrepresentation or was in error or whatever, did he have the authority to stop the forfeiture and work out an agreement, or was he speaking as a lower-level person with no authority to do that? But did he have the authority to stop the foreclosure or work out some sort of an agreement? There was not evidence going into that depth of whose authority, as helpful as that would be today. What Mr. Taylor said is, I'm going to send you this application. If you send it back, we're going to show this as an active workout. That may at least put off the foreclosure while underwriting is looking at it and we'll see if we can approve you for a repayment plan. But none of that would have precluded the foreclosure from ever happening. I mean, conceivably, that process, had she actually sent the form in, we know that she didn't, but had she sent it in, it might have conceivably put it off a month while things were in process. But it's still speculation. There's still no evidence that something would have actually come to fruition to prevent the foreclosure from actually happening, and that's what the district court got fixated on, I think appropriately so. Where's the link? And if you're talking about an agreement, the same can be said for legal action. There's no evidence that you would have actually done any of the things, no evidence you would have hired a lawyer to declare bankruptcy or to get a TRO, no evidence that a TRO would have been appropriate in this case and something actually would have happened. Is there any evidence that they had used a lawyer prior to the foreclosure? I believe the testimony was that they had not. They had not consulted an attorney on previous foreclosure. When they'd received, I think, two prior occasions, they'd gotten foreclosure notices and hadn't done anything. That was what I think helped the district court in weighing the credibility of her hypothetical of saying, no, I just don't believe her. She says that she would have called a lawyer, but she never had before, and she'd gotten this far before. So what's different now? That is, of course, one of those credibility weighing where we must give deference to the trial judge. Judge Love was there. He was able to listen to the witnesses, and that is why the burden is extremely high on the appellants in this case at this phase. They've got to show not just that the fact-finding, the lack of causation evidence was wrong, but that it was clearly erroneous. If it is at least plausible, that's really all we've got to show. If that finding was plausible, something more than speculative, which is where we find the appellants in this case, if it's plausible, that fact-finding has to be upheld. Unless the court has other particular questions, I will release my time back to you, Your Honors. Thank you. We'll take it. Thank you. So where were you when we so goodly cut you off? Thank you, Your Honor. I was getting ready to take up the issue of causation. I think that, well, first of all, let me say that in our proposed findings of fact and conclusions of law that we sent to the court before the court ever issued its findings of fact and conclusions of law, we included a part of the statute of the Texas Debt Collection Act that discusses what damages are recoverable. Now, why is that important? Simply because it shows what the causation is. And in my view, I can't point to a finding of fact or conclusion of law where the court says this is the standard for causation. The court never says the standard. But what I can glean from the decision that the court made was that it was using the standard approximate cause. That's not the standard under the Texas Debt Collection Act. Now, so how do we know that? Because the statute says that the person is entitled to direct and indirect damages. All right. Well, specifically, direct and indirect economic damages. It also, you can recover actual damages and mental anguish and all of that. But where I want to go with this is indirect damages. And as you will recall from the old case of Hadley v. Baxendale. Or maybe we won't. From law school. Back in the 1800s when the court started to recognize what we now call consequential damages. Well, as you know, there's a different standard for that. And the Texas Supreme Court has articulated that standard. And the standard is, is the harm reasonably foreseeable? Okay. When he made the misrepresentation, then now the harm of foreclosure is reasonably foreseeable. So that's where I wanted to go with that, is to show that even though the court didn't specifically say in its findings of fact and conclusions of law the standard that it was using or going to use, from my reading, from what I can glean from that, is he's using a standard proximate cause. And he's saying, well, foreclosure happened, so no damages. But if you look at, from the statement that the CSR made, that the harm that could be incurred was reasonably foreseeable by telling her, you don't need to worry. No problem. Now, to answer your question that you asked a counsel about what was the amount that was probably owed, well, she tried to find that out a number of times and never could. But I took it upon myself to calculate it from the statements of the lenders, and it appears that the $11,000 would have been about $7,000 or $8,000 short. So that's what I could glean from that. Now, counsel also said that, well, she never sent the form in. Well, wait a minute. The testimony was clear that she had a generic form that she used to send Shell Point the same day, October 3rd, that she had the conversation, filled it out, gave them everything, and sent it. That's in the record. And lastly, counsel also pointed out that, well, what she would have done, could have, would have, should have, there's no evidence of that, and so there's no showing that she would have done something to get some relief. Well, part of the record was that she had Mr. Varicki's name, that if things didn't go well with this October 3rd conversation, that she had his name, he's one of my law partners, to do something to try to stop the foreclosure. Okay. Thank you, Mr. Picard. Thank you very much. That concludes this panel's hearings.